JUDE G. GRAVOIS, Judge.
|2This is an appeal by Nicole Ann Mendoza, plaintiff-appellant, from a judgment of the trial court awarding sole custody of the two minor children of her marriage to the children’s father, her ex-husband, Kevin Mendoza, defendant-appellee. For the following reasons, we affirm the judgment of the trial court.

FACTS AND PROCEDURAL BACKGROUND

The marriage of Nicole and Kevin was dissolved in 1998, at which time they had two minor daughters. By consent of the parties, joint custody was ordered, with Nicole being named the custodial parent. That arrangement persisted until 2006, when Nicole became involved in a contentious divorce from her second husband. It further appears that prior to that proceeding, Nicole had been diagnosed with a bipolar condition which the Social Security Administration determined was of sufficient severity to qualify her for disability benefits. Kevin filed a rule to change the custodial arrangement, and on May 11, 2006, a second lsconsent judgment was entered into continuing the joint custody regime, but making Kevin the custodial parent.
Beginning in 2009, various legal skirmishes were instituted by the parties which culminated in an April 21, 2010 consent order that Nicole be evaluated by a mental health professional to determine if joint custody should be continued. This evaluation was done by a clinical psychologist, Rafael Salcedo, Ph.D. A hearing on the rule to determine the custody regime was held on September 7, 2010, with Nicole appearing in proper person. After hearing testimony from the parties, the trial court granted Nicole thirty days to provide the deposition of Dr. Anwar Ismail, her treating physician for her bipolar disorder. Upon request, she was subsequently given additional time, until October 21, 2010, to submit the deposition. When the deposition was not produced by November 22, 2010, the trial court issued its judgment. On December 1, 2010, Nicole sought leave to submit the deposition. The trial judge denied her request. Three weeks after rendition of the judgment, and some two weeks after she had filed her notice of appeal, Nicole urged a motion for written reasons for judgment, which was also denied by the trial court as untimely.
The judgment of November 22, 2010 granted Kevin sole custody of the two children, with specific visitation privileges being permitted to Nicole. Nicole now appeals.
Five assignments of error are urged. Three of these assignments challenge the award of sole custody to Kevin. The fourth assignment asserts that it was error for the trial judge to exclude the deposition testimony of Dr. Ismail, and the final assignment contends that it was error for the trial judge to deny Nicole’s request for written reasons for judgment.

ASSIGNMENT OF ERROR NO. ONE— Failure to apply the Bergeron standard

Nicole first argues that the trial court erred in not applying the rule of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). In that case, the Supreme Court held that where a considered decree of custody has been made, the party seeking a change bears a heavy burden of showing *414 by clear and convincing evidence that the arrangement is so deleterious to the child as to justify changing the decree. In the present matter, there was never a considered decree issued by the court. Rather, the original 1998 decree and the subsequent 2006 decree were both done by way of consent of the parties. Thus, the Ber-geron standard of proof is not applicable here. Penn v. Penn, 09-213 (La.App. 5 Cir. 10/27/09), 28 So.3d 304. We thus reject this assignment of error.

ASSIGNMENT OF ERROR NO. TWO— Exclusion of plaintiff’s doctor’s deposition

Nicole’s next assignment of error asserts that the trial court erred in excluding the introduction of the deposition of Dr. Anwar Ismail, her treating physician for her bipolar disorder. This problem arose because Nicole had not requested a subpoena for Dr. Ismail’s appearance at trial in sufficient time for him to be served. As noted above, the trial judge granted Nicole thirty days to take Dr. Ismail’s deposition and to file it into the record. On Nicole’s motion, she was granted additional time, until October 21, 2010, to file the deposition, but failed to do so. Having not received the deposition or a motion for a further extension of time by November 22, 2010, the trial judge issued his judgment. A December 1, 2011 motion by Nicole to allow introduction of the deposition was denied by the trial court as untimely.
|sA motion to hold a case open for submission of additional evidence is in the nature of a request for a continuance. Juneau v. Richard, 96-215 (La.App. 3 Cir. 11/13/96), 682 So.2d 1010, writ denied, 96-2988 (La.1/31/97), 687 So.2d 413. Continuances are governed by La. C.C.P. arts. 1601, et seq. Article 1602 provides peremptory grounds for which a continuance shall be granted and includes the situation where a party has been unable, “with the exercise of due diligence, to obtain evidence material to his case.” In the present case, Nicole failed to request a subpoena for Dr. Ismail’s appearance at trial in sufficient time for him to be served. Nonetheless, the trial judge granted her thirty days to obtain the deposition, and then further extended that time at her request. When the deposition was not filed by the extended date, the trial judge waited an additional thirty days during which time the deposition was still not put into evidence. At that point, the trial judge issued his judgment. A decision on whether to hold a case open for submission of additional evidence lies within the sound discretion of the trial judge, and will not be disturbed on appeal absent clear error. Juneau v. Richard, supra. We find no such error here. This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. THREE — Awarding of sole custody to the father
In her next assignment of error, Nicole argues that the trial court erred in not awarding joint custody of the children to her and Kevin, as per La. C.C. art. 132.
In Penn v. Penn, supra, this Court explained the procedures to be used when a change in a consent custody decree is sought. It first noted that the primary consideration in custody disputes is always the best interest of the child. La. C.C. art. 131. Where the parents agree to a custody arrangement, that arrangement should be followed, unless the best interest of the child requires a different result. |fiWhere the parents cannot agree, the court shall award joint custody unless it is shown by clear and convincing evidence that sole custody is in the best interest of the child. La. C.C. art. 132. In determining the *415 child’s best interest, the court is to consider the non-exclusive list of factors set forth in La. C.G. art. 134, but is not bound to make a mechanical evaluation of each. Rather, a custody decision must be made in light of the peculiar set of facts and relationships involved in order to reach a decision as to what is in the best interest of the child. This Court further noted that a trial court’s custody determination is entitled to great weight and will not be disturbed on appeal absent a clear showing of abuse of discretion. Finally, it ruled that where the parties have consented to a custody decree, the party seeking modification must show that there has been a material change in circumstances since the original decree, and that the proposed modification is in the best interest of the child.
Because the parties agreed to the 2006 joint custody decree, with Kevin being the custodial parent, our first inquiry is whether there has been a material change in circumstances. At the time of the 1998 custody decree, the record established that because of their work schedules, Nicole and Kevin relied on the babysitting services of Nicole’s sister-in-law, Paula Gau-det. The maternal grandmother of the children, Faye Gaudet, lived next door to Paula. This arrangement continued after the 2006 decree was entered into, with Paula caring for the children from time to time. After the present rule to change custody was filed, an interim order was issued on March 9, 2010 which set forth in detail Nicole’s visitation rights. Visitation was to be every other weekend. Nicole was to pick up the children at her mother’s house at 6:00 p.m. on Friday, and return them to Paula’s house at 6:00 p.m. on Sunday. Paula was to continue to have supervision of the children on weekday afternoons after school until Kevin came 17home from work. If Nicole wished to visit the children while in Paula’s care, she could do so only if she called and received Paula’s consent, and there was to be no “humbug (stuff).” These visits were to take place at the grandmother’s house. Other provisions of the judgment related to telephone calls, travel, and child support matters.
On April 21, 2010, a consent judgment was issued ordering Nicole to submit to a mental health evaluation by Rafael Salce-do, Ph.D., a clinical psychologist. On May 4, 2010, Dr. Salcedo interviewed Nicole, the children, Kevin, and Paula, and reviewed e-mails, legal documents, and other collateral data. He also administered the Minnesota Multiphasic Personality Inventory (MMPI) — Adolescent Version tests to the girls. Nicole was also given the adult MMPI, but somehow it got lost and had to be re-given to her on June 25. While the psychologist suspected that Nicole had taken the first test out of his office, he was unable to say this with certainty.
In his report, the psychologist recited Nicole’s diagnosis of bipolar disorder. His conclusion from the first series of interviews was that she suffered from “Bipolar Disorder, In Partial Remission.” He noted that as the evaluation progressed, she would go from charming and engaging to defensive and hostile, all within minutes. He thought that she showed very little self-control “in spite of the fact that this was an evaluation obviously designed to see her ‘best behavior.’ ” His ultimate recommendation was that “her visits with the children not be increased, and that they continue to be supervised.”
After he administered the test a second time to Nicole, Dr. Salcedo noted that there were elevations in the scale for paranoia as well as that for mania. He went on to state that “this Scale 6 [paranoia] is perhaps understandable given the fact that the [mother] does actively believe that oth *416 er individuals, from her | ^perspective, are attempting to deal with her unfairly and/or harm her either psychologically or in other ways. The Scale 9 [mania] elevation is consistent with manic tendencies typically associated with Bipolar Disorder, and is consistent with my original observations of her behavior as being actively manic.”
The psychologist also examined the girls, and found that they were “relatively well adjusted, particularly under the circumstances.” He also noted that there were signs that the older fourteen-year-old girl had become “parentified,” a situation which he described as the child’s attempt to discern and take care of her psychologically disturbed parent’s needs rather than vice versa.
Paula Gaudet testified at the trial of the rule on September 7, 2010. Her pertinent testimony was that since the March 9, 2010 interim order, she had continued to watch the children after school. She stated that she had recently informed Kevin that at the end of the school year, she would no longer do so. Her reasons were that Nicole had continued to harass her in various ways via e-mails and text messages, and that the situation was intolerable. Kevin’s new wife testified that she had witnessed an incident where Nicole had been denied entry into her and Kevin’s home, and Nicole had “keyed” Kevin’s truck as she was leaving. She said that this incident was observed by one of the children. She also testified to numerous e-mails sent to her by Nicole that contained outrageous language and accusations. Kevin testified that he had been approached the year before by the principal of the children’s school in regard to the school board’s lawyer doing something about Nicole’s harassment of the girls’ teachers. These erratic behaviors on Nicole’s part substantiate Dr. Salcedo’s conclusions that Nicole suffers from paranoia and manic tendencies associated with bipolar disorder. Nicole introduced a brief letter from Dr. Ismail, her treating physician, to |athe effect that she was free of mania and depression and therefore competent to take care of her business and the children.
On all of this evidence, the trial judge implicitly found that there had been a change in Nicole’s behavior since the 2006 consent decree, and that a change of custody was in the best interest of the children. He awarded sole custody to Kevin, but continued weekend visitation with Nicole every other weekend. He reiterated that when the children were with Paula after school, Nicole could not go to the house without Paula’s express permission.
Our review of the evidence shows that although Nicole had shown some erratic behaviors in the 2006 to 2008 time-frame, the incidence of these behaviors, especially the inappropriate e-mails and text messages, increased dramatically when Kevin began seeing his present wife in mid-2009 (he eventually married her on July 19, 2010). Also beginning at about this time, Nicole had increasing problems with Paula over visitation with the children. It is evident that Kevin’s relationship with his present wife caused changes for the worse in Nicole’s behavior, and that these changes affected the children. This evidence is sufficient to support the trial judge’s implicit finding that there had been a material change in circumstances since the 2006 decree and that a change of custody was in the best interest of the children. Accordingly, this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. FOUR — Failure to consider all relevant factors in determining the best interest of the children
Nicole’s next asserts that the trial court further erred by not properly consid *417 ering the factors enumerated in La. C.C. art. 134.[1] The question before us is Imwhether the trial judge properly applied the analysis set forth in La. C.C. art. 134. As noted in Penn v. Penn, swpra, the enumerated factors are non-exclusive and simply a guide to the court in making a determination of what custody arrangement is best for the child. In the present case, there is substantial evidence that Nicole’s mental health redounds negatively on the interest of the children. It is also evident that her condition has created problems in regard to the daughters’ school environment, and her behavior is not conducive to promoting a close and continuing relationship between the children and Kevin. On the other hand, it is also clear that Nicole loves her children and fears that they may be taken completely away from her and that this apprehension is exacerbated by her bipolar disorder and often leads to erratic behavior. Considering all of these factors, we cannot say that the trial judge abused his discretion in awarding sole custody to Kevin, with enumerated visitation privileges being reserved to Nicole. Penn v, Penn, supra. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. FIVE— Declining to assign written reasons for judgment

The final issue is whether the trial judge erred in declining to give written reasons for his judgment. La. C.C.P. art. 1917A provides that a request for written reasons for judgment shall be made “not later than ten days after the mailing of the |1Tnotice of the signing of the judgment.” Notice of the signing of the judgment in question was mailed on November 22, 2010 and Nicole’s request for written reasons was not filed until December 15, 2010. It was denied by the trial judge as “untimely.” We find no error in this determination.

CONCLUSION

For the foregoing reasons, the judgment of the district court granting the father sole custody of the two children is affirmed.

AFFIRMED

. La. C.C. art. 134 provides as follows:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.